DECISION
This matter is before the Court because Defendant Ashaway Pines, LLC ("Ashaway"), seeks to establish the boundaries of a laneway (the "Laneway"), which provides access to a seventy-three acre parcel it owns in the Town of Hopkinton, Rhode Island The Laneway, roughly 500 feet long, is comprised mostly of fill and runs through swampland that abuts property owned by Plaintiffs Kenneth and Joanne Panciera ("the Pancieras"). On April 29, 2009, this Court granted Ashaway's partial motion for summary judgment and held that Ashaway owned the Laneway by adverse possession, but that "[t]his matter shall proceed to determine the precise bounds of the Laneway and on Defendant's counterclaims." During the trial, Ashaway asserted the Laneway is comprised of all the land running northerly from Route 216 in Hopkinton (the "highway"), to the southwest corner of the land described in its deed, plus the thin sliver of swamp between the western edge of the Laneway and the eastern boundary of the abutting owners. Specifically, Ashaway contends the boundaries of the Laneway are established under the doctrines of boundary by acquiescence, adverse possession and the statutory presumption of "lost grant" coupled with "strip and gore." The Pancieras contend they are the deeded owners of the property abutting the Laneway to the east, and also claim to maintain a possessory interest in the thin sliver of swamp that abuts the western edge of the Laneway Jurisdiction is pursuant to G L 1956 §§ 8-2-13 and 8-2-14 For the reasons set forth *Page 2 
herein, this Court holds the Laneway's eastern toe of slope forms the boundary between Ashaway's and the Pancieras' respective properties to the east, and declines to establish the exact parameters of the Laneway's boundary to the west
 I Facts and Travel
The Pancieras brought this action on December 19, 2007, seeking to enjoin Ashaway from trespassing on the Laneway, to quiet title to the Laneway in themselves, a declaration that their property includes the Laneway, and damages for slander of title On December 19, 2007, this Court issued a temporary restraining order barring Ashaway from altering the Laneway or proceeding with Ashaway's application for a special-use-permit before the Hopkinton Zoning Board. On February 8, 2008, this Court denied the Pancieras' prayer for a preliminary injunction Subsequently, on November 17, 2008, Ashaway filed a counterclaim seeking to quiet title in the laneway in itself, based upon theories of adverse possession, boundary by acquiescence, and lost grant. On April 29, 2009, this Court granted Ashaway's partial motion for summary judgment and held Ashaway had title to the Laneway by adverse possession The Court dismissed the Pancieras' complaint, but decided "[f]urther proceedings are necessary, however, in order to determine the precise bounds of the laneway."
On October 20, 21, 26, 27, 29, 30, 2009, and November 2, 3, 4, 9, 2009, this matter was tried before the Court sitting without a jury to determine the exact boundaries of the Laneway At trial, the following facts were elicited from testimony and numerous exhibits.[1] *Page 3 
1. The Property[2]
Ashaway owns a parcel of land in Hopkinton, Rhode Island ("the Property"), recorded as Lots 7 and 7C on Hopkinton Tax Assessor's Plat 3. The Property has no road access except for a long, artificial causeway composed of fill running through a swamp The Property has the configuration of a saucepan with the "pot" portion of the tract containing approximately seventy-three acres. The "pot" has no deeded access and is landlocked. The "panhandle," the Laneway, provides the only access to the lot and is a man-made elevated causeway, which runs through a swamp.
The Property is a portion of a three hundred thirty-seven acre tract, which Weeden Barber, Jr ("Barber") took title to in 1834 by deed from William and Caroline Thurston[3] A survey from the early 1800s depicts the Property, the southwesterly portion of which was bounded westerly by the land of Joseph D. Kenyon and southerly by "the highway." In 1831, Joseph D Kenyon acquired title to the land abutting the western boundary of the Thurston tract and the northern edge of the highway ("the Joseph Kenyon tract"). After these conveyances, the southeast corner of the Joseph Kenyon tract abutted the southwest corner of the Thurston *Page 4 
conveyance to Barber
Subsequently, on June 7, 1855, Barber conveyed a landlocked forty acre portion of this land to Nathaniel H. Cook ("Cook")[4] The deed does not discuss any possible ingress or egress to the Property, and the metes and bounds description does not describe the Laneway In 1861, Cook took title to the northern thirty-one acres of the Property from Henry Clark. This conveyance also does not mention any potential avenues of ingress of egress to the Property. As a result, as of 1861, the Property existed in its current seventy-three acre condition, without any deeded right-of-way for ingress or egress
Thereafter, in April 1881, Cook conveyed the Property to James Cook.[5] Then, in March 1884, James Cook conveyed the Property to Jane Cook[6] In February 1894, Jane Cook conveyed the Property to Gurdon Cook.[7] Later, in December 1902, Gurdon Cook conveyed the Property to Frederick and Amanda Peterson.[8] In July 1912, Frederick and Amanda Peterson conveyed the *Page 5 
Property to Pietro and Regina Panciera[9] In November 1942, Louis Panciera, Antone Manetti, and John Ferguson as Executor of the Will of Regina Panicera executed separate deeds to convey their respective interest in the Property to George and Nellie Manfredi[10] Subsequently, in 1979, George and Nellie Manfredi conveyed all of the Property, except for the one-acre lot where the original farmhouse sits, [11] to Nancy Vuono.[12] Sometime during or after Nancy Vuono's ownership of the Property, the Laneway came to be known as "Vuono Place." In July 2000, Nancy Vuono conveyed the Property to a limited liability company, Vuono Place, LLC.[13] In October 2000, Sarah Land Company, LLC f/k/a Vuono Place, LLC formally conveyed the Property to Sarah Land Company, LLC.[14] In October 2004, Sarah Land Company, LLC conveyed the Property to Ashaway.[15] No recorded document from a third-party purports to grant a right-of-way to the Property, and no recorded deed of an abutting property states that it is subject to a right-of-way benefiting the Property
2. The Eunice Kenyon Tract *Page 6 
In 1849, Barber conveyed a parcel in the southwest corner of his estate to Eunice Kenyon, which was bounded westerly by the land of Joseph Kenyon and southerly by the highway (the "Eunice Kenyon tract"). The western border of the Eunice Kenyon tract abuts the Laneway, and prior to the Laneway's construction, abutted the Joseph D. Kenyon tract (the "Kenyon tract"). . The Pancieras are now the record owners of this lot, and have deeded their development rights in the lot to the State of Rhode Island.See Df. Ex LLLL.
Prior to 1874, the conveyances of the Eunice Kenyon tract called out the Joseph Kenyon tract as the western boundary of the property However, in 1874, this changed when the conveyance from Amos Kenyon to George Burdick described the Eunice Kenyon tract as being bounded on the west "by the land of Nathaniel H. Cook "Subsequent conveyances also explicitly recognized the Laneway as the western boundary of the Eunice Kenyon tract In 1922, a conveyance from George Burdick to Jennie Palmer describes the western boundary as "land (Laneway) formerly of Nathaniel H Cook" Additionally, the deed from the heirs of Jennie Palmer to Thomas Winn includes the same call in 1936.
Subsequently, deeds from Thomas Winn to Joseph and Albert Romanella contain specific courses, distances, and monuments to describe the boundaries of the Eunice Kenyon tract. . This monumentation sets the western boundary of the Eunice Kenyon tract roughly forty feet east of the Joseph Kenyon tract, essentially accounting for the Laneway. In 1965, the Romanellas conveyed a thirty-foot wide strip of land to the Manfredis, "the westerly 30 feet, more or less, of the premises conveyed to Joseph F. Romanella, et al, by deed of Thomas F. Murano, dated August 3, 1957 and recorded in the Land Evidence Records of the Town of Hopkinton in Book No 47 at page 383 "The courses, distances and monuments referred to in this deed place the thirty-foot strip immediately adjacent to the eastern boundary of the Laneway. *Page 7 
 3. The Joseph Kenyon Tract
Joseph D. Kenyon took title to two large parcels in 1831 which totaled roughly seventy-six acres. The easterly portion of one of these parcels abutted the 337-acre tract conveyed to Barber in 1834. In 1909, Joseph Kenyon's heirs conveyed the southeastern portion of the property to George Ennis This deed described the property as being bounded "on the south by the aforesaid highway and on the east by lands of Fred W. Peterson."[16] Implicit in this conveyance are the heirs of Joseph Kenyon's beliefs the Petersons owned the Laneway, and that the Laneway abutted the Joseph Kenyon tract to the highway
In September of 1922, George Ennis conveyed a one-acre tract to Mary Northup that involved the same southeastern corner The deed described the northern boundary as running "easterly on said Ennis land 420 feet to a laneway leading to Panciera premises, thence southerly one hundred feet more or less, by said laneway to the highway leading from Ashaway to Bradford." During 1922, Pietro and Regina Panciera owned the Property Later, in 2001, a subsequent conveyance of this parcel to Michael Geary and Debra A Darmainin (the "Geary property") also contained the same description Thus, deeds of the eastern portions of the Joseph Kenyon tract, south of the Property, also recognized the Laneway as an abutting landmark
James and Linda Vadakin own a stretch of land north of the Geary property and south of what is now the Stafford lot[17] The eastern boundary of this parcel is described as from a "point marking the southeasterly boundary of said Stafford land; thence turning in a general southerly, southeasterly direction along the western boundary of a private way leading to said Stafford land to the point and place of beginning." All of the deeds in the chain of title to this eastern portion of the Joseph Kenyon tract contain the same description *Page 8 
 4. The Laneway
The Laneway itself is an artificial causeway consisting of fill and runs through a swamp The Laneway has provided ingress and egress to the Property since at least 1870 Michael McCormick ("McCormick"), the Pancieras' land surveyor and expert witness, testified that Cook probably used it. McCoRmick also believed the Laneway provided the only means of ingress and egress for all the owners of the Property after Cook. Until 1930, the Laneway benefited no other property However, in 1930, one of Ashaway's predecessors in title granted a right-of-way over the Laneway to benefit an adjacent landlocked parcel See Df. Ex KK. Further, the 1870 Hopkinton Town Atlas shows the Laneway running from the highway into the Property, as does the 1895 Atlas See Df. Exs WWW, XXX The Atlases are to scale, and depict the Laneway in the same location as aerial photographs from 1939 to 2004. . See Df. Exs. EEEE through IIII
The laneway has remained largely unchanged since its construction due in large part to the wet terrain it traverses Christopher Duhamel ("Duhamel"), a civil engineer, and land surveyor testified the Laneway has run through a swamp since 1870. . Both the 1870 and 1895 Hopkinton Town Atlases depict a brook running through the Laneway. . The 1870 Hopkinton Town Atlas shows the brook touching the Laneway's northern tip, while the 1895 Hopkinton Town Atlas locates it in the middle of the Laneway See Df Exs WWW, XXX. Kenneth Panciera noted the brook runs through the Eunice Kenyon tract and underneath the laneway See Df. Ex. LLLL. Currently, the brook exists in roughly the same location depicted on the 1895 Hopkinton Town Atlas, which caused Duhamel to conclude the location of the brook in the 1895 Hopkinton Town Atlas is correct.
The Laneway exists at a grade noticeably higher than the swamp. The interface between the swamp and Laneway is clearly visible where the fill of the Laneway slopes downward to *Page 9 
meet the swampland. Culverts exist at two points underneath the Laneway, which allow water to flow from one side to the other. Telephone poles also run along the Laneway and provide electricity and telephone service to the neighboring properties.
Both parties surveyed the Laneway to plot its dimensions and presented them at trial. Duhamel of DiPrete Engineering conducted a survey for Ashaway, and McCormick prepared a survey for the Pancieras. See Df. Ex. JJJJ; P1. Exs. 1A, 1B. Both parties plotted the dimensions of the Laneway, which are largely consistent with each other. The surveys only materially differ in their placement of the culverts that run underneath the Laneway. A small sliver of swamp lies between the western interface of the Laneway and the eastern boundary of the Joseph Kenyon tract, now the Vadakin property. The Pancieras claim to retain an ownership interest in this sliver of swamp
 II Analysis A Standing
As a preliminary matter, the Court notes Ashaway contests the Pancieras' standing to challenge the dimensions of the Laneway According to Ashaway, the Pancieras cannot show an injury in fact because they cannot show an interest in any land abutting or encompassing the Laneway Specifically, Ashaway contends the Pancieras' 1910 "root deed" does not convey any land near the Laneway to the Pancieras' predecessors in title. . Further, Ashaway suggests the "meaning hereby to convey" clause contained in their root deed is insufficient to convey any interest in the Eunice Kenyon tract Conversely, the Pancieras assert Ashaway's contention is unavailing, because Ashaway's title examiner conducted a search of the probate and land *Page 10 
evidence records under the name of Weeden Barber, Sr. — who never owned the Eunice Kenyon tract — as opposed to Weeden Barber, Jr.
However, Ashaway only alleges the Pancieras lack standing "[i]n the alternative," if the Court finds the Pancieras have an ownership interest in any land west of the eastern toe of slope of the Laneway. Based on this Court's decision regarding boundary by acquiescence, the Court assumes, without deciding, the Pancieras are the owners of the Eunice Kenyon tract
 B Boundary by Acquiescence 1. Eastern Boundary of the Laneway
Ashaway argues the eastern toe of slope of the Laneway constitutes a boundary by acquiescence. According to Ashaway, because it adversely possessed the Laneway, "[t]his necessarily renders the eastern toe of slope a boundary "Ashaway argues the eastern toe of slope "has served as such for at least seventy-odd years per this Court's prior ruling, and probably for over 130 years "Specifically, Ashaway contends the eastern toe of slope creates a boundary where it meets the natural terrain of the Eunice Kenyon tract Conversely, the Pancieras "do not disagree that the eastern toe of slopemay form a boundary between land owned by [Ashaway] and [the Pancieras] . however, . [the Pancieras'] position is that the granite boundaries" on the western line of the Pancieras' property may create another boundary that preserves their interest in the thin sliver of swamp. According to the Pancieras, these granite blocks — which lie to the west of the Laneway's toe of slope — and delineate the historic boundary between the Eunice Kenyon tract and the Joseph Kenyon tract constitute a second boundary. Specifically, the Pancieras assert "[t]hese granite boundaries are sufficiently *Page 11 
observable to command notice in that they are clearly visible in the field and put all parties on notice as to where the adjoining property owners consider the line to be."
"Like adverse possession, the doctrine of acquiescence to an observable physical boundary line constitutes a recognized means by which a claimant can gain title to the real estate encompassed by that boundary line, even though another party clearly possesses record title to that land." Pucino v. Uttley,785 A.2d 183, 186 (R I. 2001) (citing DelSesto v. Unknown Heirsof Lewis, 754 A.2d 91, 95 (R.I. 2000)). "[A] party alleging acquiescence must show that a boundary marker existed and that the parties recognized that boundary for a period equal to that prescribed in the statute of limitations to bar a reentry, or ten years." Id. at 186-87 (quoting Locke v. O'Brien,610 A 2d 552, 556 (R I. . 1992)). . The Rhode Island Supreme Court has held, "that recognition of a boundary line can be inferred from the silence of a party, or his predecessor in title, who is aware that it exists." Acampora v. Pearson,899 A 2d 459, 465 (R.I. 2006).
In order for the eastern toe of slope to qualify as a boundary, "the line must be marked in a manner' that customarily marks a division of ownership and the marker must have been used for boundary purposes." Acampora,899 A 2d at 465 (citation omitted). Various courts have held roadways and driveways may constitute a boundary for the purposes of establishing boundary by acquiescence See, e.g.,Marja Corp. v. Allain, 622 A.2d 1182, 1185 (Me. 1993) (holding a roadway in existence for fifty years, located on maps, and "readily discernible visually by the edge of vegetation and the remains of fences and stone walls" was a clearly marked visible line for boundary purposes)[18] In this case, the Court is satisfied the eastern toe of slope *Page 12 
of the Laneway meets both of these requirements As a preliminary matter, the Court notes the very construction and composition of Laneway creates a natural disturbance where the Eunice Kenyon tract ends and the Laneway begins The interface between the Eunice Kenyon tract and the Laneway has been plainly visible since the 1800s and clearly delineates the Eunice Kenyon tract from the Laneway Indeed, because the Laneway traverses a swamp, the portion of the Laneway actually traveled upon needs to be elevated As a result, the earthen material composing the Laneway slopes downward from the traveled surface, until it eventually interfaces with the natural, wet, and swampy terrain it passes through. As such, the distinct and readily visible area where the Laneway meets the Eunice Kenyon tract renders it "`certain, well defined, and in some fashion physically designated upon the ground'" Friends of Columbia Gorge,Inc. v. United States Forest Service,546 F. Supp 2d 1088, 1092 (D. Or 2008) (quoting Lamm v. McTighe,434 P 2d 565 (Wash 1967)).
Further, the Laneway has been in existence since the 1800s and has been depicted in the town atlases and tax assessor's maps for over a century. . Moreover, the testimony and evidence procured at trial indicated the Pancieras, and their predecessors in title, treated all land west of the eastern toe of slope of the Laneway as owned by someone else Additionally, the deposition testimony of Kenneth Panciera also supports the contention the Pancieras accepted the eastern toe of slope as the boundary. According to Kenneth Panciera, he never used the isolated sliver of swamp, and only accessed the Laneway to "perambulate," or visit owners of neighboring properties Further, even though Kenneth Panciera intended to convey all rights in the Eunice Kenyon tract, and did not intend to omit any part thereof, the land described in the Pancieras' 2005 Deed To Development Rights stops at the eastern edge of the Laneway.See Df. Ex. LLLL *Page 13 
at 100, 107 Not only did the 2005 Deed To Development Rights not include any portion of the Laneway, it necessarily excluded any portion of the sliver of swamp as well
Most importantly, the deeds in the Pancieras' own chain of title recognize the eastern toe of slope of the Laneway as forming their western boundary.[19] In 1849, Barber, conveyed a parcel in the southwest corner of his estate to Eunice Kenyon, bounded westerly by the Kenyon tract, and southerly by the highway.See Df. Ex QQ. A subsequent conveyance from Eunice Kenyon to Amos Kenyon contains the same call for the western boundary in the deed See Df Ex RR However, the 1874 deed from Amos Kenyon to George Burdick recognized the eastern toe of slope of the Laneway as the boundary At some point between 1857 and 1874 Amos Kenyon relinquished any ownership interest in the Laneway Amos Kenyon either deeded it to Cook through some unrecorded conveyance, or consented to Cook's ownership of the Laneway. Indeed, Kathy McCuin ("McCuin"), John Ferri ("Ferri"), and McCormick all testified and agreed that an unrecorded deed from Amos Kenyon to Cook could explain the discrepancy In fact, the conveyance from Amos Kenyon to George Burdick specifically acknowledged this possibility when it described the land conveyed to Burdick as bounded "[w]esterly by land of Nathaniel H Cook "Although this conveyance does not explicitly denote the location of the Laneway, it nevertheless recognizes the westerly boundary of the Eunice Kenyon tract as Cook's property
Subsequent conveyances explicitly recognize Cook as the owner of the Laneway, while others call out courses, distances and monuments that set the western boundary as the eastern edge of the Laneway. For instance, the 1922 conveyance from George Burdick to Jennie Palmer calls out the western boundary as "land (Laneway) formerly of Nathaniel H. Cook "See Df. Ex TT. Additionally, the 1936 deed from the heirs of Jennie Palmer to Thomas Winn includes the same call See Df Ex. UU Further, the deed from Thomas Winn to the Romanellas contains *Page 14 
specific courses, distances, and monuments, which set the western boundary of the Eunice Kenyon tract at the eastern edge of the Laneway, roughly thirty feet east of the old Kenyon property. As such, this Court is satisfied the Pancieras' predecessors in title accepted the eastern edge of the Laneway as the boundary to the Eunice Kenyon tract since at least 1875 based upon the recorded deeds
As a result, the Court finds Ashaway has sufficiently established the eastern toe of slope of the Laneway as a boundary by acquiescence. In making a determination as to the exact parameters of the eastern toe of slope of the Laneway, the Court notes the plans submitted by the Pancieras' and Ashaway's engineers differed only in their location of the culverts under the Laneway. In this case, the Court adopts the "Illustrative Composite Plan" submitted by Ashaway and created by Duhamel of DiPrete EngineeringSee Df. Ex. JJJJ. As such, the eastern toe of slope contained in the plan created by Duhamel represents the boundary between the Eunice Kenyon tract and the Laneway.
2. Western Boundary of the Laneway
The Pancieras argue the granite boundaries west of the Laneway create another boundary, which preserves their interest in the thin sliver of swamp According to the Pancieras, Ashaway's claim of adverse possession only extends to the land actually possessed by it, and that no evidence of abandonment was adduced at trial The Court finds this argument misplaced. First, boundary by acquiescence does not entail proof of the same elements of adverse possessionSee, e.g., Killips v. Mannisto,614 N.W 2d 224, 226 (Mich. Ct. App. 2001) ("Unlike a claim based on adverse possession, an assertion of acquiescence does not require that the possession be hostile or without permission"). Second, boundary by acquiescence does not require a litigant to establish use up to the boundary line. Myers v. Yingling,279 S W 3d 83, 87 *Page 15 
(Ark. 2008) ("Nor is there any requirement of adverse usage up to a boundary fence to establish a boundary by acquiescence ").
Moreover, the deeds to the Joseph Kenyon tract also evidence that the Pancieras did not reserve an ownership interest in the sliver of swamp. The deeds to the Joseph Kenyon tract describe its eastern boundary as the Laneway or land owned by Ashaway's predecessors in title For example, deeds to the Joseph Kenyon tract describe the boundary as running parallel to the Laneway as starting at "a point marking the southeasterly boundary of said Stafford land; thence turning in a general southerly, southeasterly direction along the westerly boundary of a private way leading to said Stafford land to the point and place of beginning."See Df. Exs. ZZ, AAA In this context, the Rhode Island Supreme Court has interpreted "along" to mean "parallel to and adjacent. . . ." Carpenter v. Hanslin, 900 A.2d 1136, 1148 (R.I 2006) This description is also consistent with the deeds in the chain of title of the Northup/Geary lot, which describe its eastern boundary as bounded by the Laneway. After the construction of the Laneway, the deeds to the Joseph Kenyon tract consistently reference the Laneway as the eastern boundary of the parcel, no reference is made to the Pancieras, or their predecessors in title Pursuant to G L. 1956 § 34-13-2, the Pancieras had constructive notice of these conveyances because they were recorded, "[a] recording or filing under § 34-13-1 shall be constructive notice to all persons of the contents of instruments and other matters so recorded, so far as they are genuine." In this instance, and for all the reasons previously discussed regarding the Pancieras lack of use of the Laneway or sliver of swamp, the Court is satisfied that by accepting the eastern toe of slope of the Laneway as a boundary, the Pancieras relinquished what, if any, interest they might have had in the sliver of swamp. *Page 16 
As such, the Court declines the invitation of the Pancieras to determine the exact boundary of the Laneway's western toe of slope. The owners of the parcel abutting the Laneway's western toe of slope are not presently before the Court, and without any ownership interest in the land, the Pancieras are without standing to challenge its location Therefore, this Court elects not to determine the exact location of the Laneway's western boundary on this occasion
 C Adverse Possession and Lost Grant
Ashaway also contends the Pancieras have lost any property interest in the land west of the Laneway's eastern toe of slope under the doctrines of adverse possession and lost grant in conjunction with strip and gore. However, having decided the Pancieras lack any ownership interest in the land west of the Laneway's eastern toe of slope under the doctrine of boundary by acquiescence, this Court need not, and therefore does not, reach the issue of whether the doctrines of adverse possession and lost grant apply to the facts at bar.
 III Conclusion
Based on the foregoing, this Court finds the eastern toe of slope of the Laneway to be a boundary by acquiescence, which divides the Pancieras' and Ashaway's respective properties. In establishing the exact parameters of the eastern toe of slope, this Court adopts the "Illustrative Composite Plan" created by Duhamel. See Df Ex JJJJ. Further, this Court holds that in accepting the eastern toe of slope of the Laneway as a boundary, the Pancieras lost what interest, if any, they had in the sliver of swamp west of the Laneway As a result, because the Pancieras *Page 17 
have no interest in any land west of the eastern toe of slope of the Laneway, the Court elects not to establish the western boundary of the Laneway
Counsel for Ashaway shall submit an appropriate order for entry in accordance with this Decision within ten (10) days. *Page 18 

[1] The Court notes the transactions and conveyances giving rise to this dispute are convoluted and numerous, dating back to the early 1800s In its decision, the Court has attempted to narrow the facts to only those directly material to the outcome of the case.
[2] For ease of reference, the Court has appended a survey map of the relevant properties at the end of its decision.
[3] The deed from the Thurstons to Barber contains a metes and bounds description followed by a reference to a plat:
 Beginning at the southwest corner of said land it being the southeast corner of Joseph D. Kenyons land thence running easterly bounding southerly by a highway until it comes to a lot of land belonging to Joseph M Knowles thence running easterly bounding southerly by said Knowles land until it comes to the Paucatuck River thence bounding by said River up stream until it comes to Deacon Weeden Barbers land thence running west to land of David L Langworthy bounding northerly by heirs of Hezekiah Babcock land partly and partly by land of Thomas P Wells — formerly Elder John Gardner's Land — thence running southerly bounding westerly by said Langworthy's land from there running west four and one quarter degrees north till it comes to a stake and stones — and from thence running westerly bounding northerly by said Langworthy's land partly and partly by heirs of William Coon land till it comes to a heap of stones — from thence running south thirteen degrees east thirty four chains and twelve links and bounded westerly by Joseph D Kenyon's land to the first mentioned bounds or however the same may be bounded the same being described on the plat of the division of the real estate of George Thurston Esq Jeremiah Thurston and George Thurston Jun late of Hopkinton deceased contains the lot No 10 which fell to Caroline Thurston in the divisions aforesaid which of record will fully appears. . . .
[4] This deed describes a parcel of "forty one and one sixth acres. . . .more or less" by the following metes and bounds:
 Beginning at the northwest corner, it being the northeast corner of Joseph D. Kenyon's land thence running south ten degrees east bounded westerly by Joseph D Kenyon's lands 26 chains and 15 links thence north fifty four and a half degrees east fifteen chains sixty nine links, thence south sixty five degrees east four chains thirty two lengths thence north 11 3/4 east 16 chains 75 links to the southeast corner of Henry Clark's land bounded by land of the said Weeden Barber Jr easterly and southerly thence 24 chains 88 links to the first named corner bounded northerly by land of Henry Clark.
[5] This deed describes the land as follows:
 the first lot contains forty three acres more or less, with the dwelling house and other improvements thereon standing is bounded Northerly on land of Charles H. Crandall. Easterly and Southerly by land of Weeden Barber and Westerly by land of Joseph D Kenyon's heirs The second tract contains by estimation thirty acres more or less is bounded Northerly by land of said Charles H Crandall Easterly by land of said Weeden Barber Southerly by the first tract herein named and Westerly by land of Perry I Palmer.
[6] In addition to providing a metes and bounds description, this deed contains the following description: "the same premises conveyed to me by Nathaniel H. Cook and wife by their deed dated April 4th 1881. . ."
[7] In addition to providing a metes and bounds description, this deed contains the following description: "the land conveyed to me by James H Cook by deed recorded in Deed Book in said Hopkinton No 20 at page 5-83 following "The deed also purports to convey the land "with dwelling house and other improvements thereon. . . ."
[8] In addition to providing a metes and bounds description, this deed contains the following description: "[the] same premises conveyed by Deeds of Weeden Barber and Henry Clarke to Nathaniel H Cook." The deed also purports to convey the land "with dwelling house, barns and other improvements thereon. . . ."
[9] In addition to providing a metes and bounds description, this deed contains the following description: "[the] same premises conveyed by Gurdon Cook to these grantors by deed dated July 30, 1912, and recorded in Records of Deeds in said Town of Hopkinton, book 29, page 108 "The deed also purports to convey the land "with dwelling house, barn and other improvements thereon. . ."
[10] In addition to providing a metes and bounds description, these three deeds contain the following identical description: "the same premises conveyed by Frederick W. Peterson and Amanda C Peterson to Pietro Panciera and Regina Panciera by deed dated December 18th, 1902 and recorded in Land Evidence of said Hopkinton Book No. 26 at Page 331, and same premises conveyed by Deeds of Weeden Barber and Henry Clarke to Nathaniel H Cook."
[11] It is uncontested that the Manfredis later conveyed the house lot to Vuono as well.
[12] This deed describes one parcel of conveyed land as follows:
 A certain lot or tract of land situated in said Hopkinton containing [sic] by estimation 73 acres, more or less, and is bounded substantially as follows: Northerly by the land of the heirs of Cristofore Panciera, Easterly and Southerly by land formerly of Weeden Barber and Westerly by land now or formerly of heirs of Joseph D Kenyon and land now or formerly of John and Caroline Cantelin and being the same premises conveyed by Frederick W Peterson and Amanda C Peterson to Pietro Panciera and Regina Panciera by deed dated July 30, 1912 and recorded in records of deeds in said Town of Hopkinton, Book 29, page 108.
[13] This deed describes the land first as "[t]hat certain tract or parcel of land, with all buildings and improvements thereon, located at 22 Vuono Place . being more particularly bounded and described on EXHIBIT `A' . . EXHIBIT "A" provides the same description as the deed from the Manfredis to Vuono Seesupra at n 12.
[14] This deed contains exactly the same description as the deed described supra at n 13.
[15] This deed contains exactly the same description as the deed described supra at n 13.
[16] Peterson was the deeded owner of the Property during this time period.
[17] George Ennis created the Stafford lot in a conveyance to Arthur and Gladys Panciera in 1930.
[18] See also Huntington v. Riggs,862 N E.2d 1263, 1270 (Ind Ct App. 2007) (landowners treated road as establishing a fence between two properties); Killips v.Mannisto, 624 N W 2d 224, 226-7 (Mich. Ct App 2001) (finding the trial court did not err in concluding the plaintiffs established acquiescence by their use of a driveway); Feldmann v.Qstwinkle, No 05-1157, 2006 WL 469972, at *4 (Iowa Ct App March 1, 2006) (affirming judgment establishing roadway as boundary)
[19] See Df Exs QQ, RR, SS, TT, UU, WW, XX, YY.